THOMAS FOSTER, RESPONDENT, v. JAMES M. KURN AND JOHN G. LONS-
DALE, TRUSTEES OF THE ST. LOUIS-SAN FRANCISCO RAILWAY COM-
PANY, A CORPORATION, APPELLANTS.—133 S. W. (2d) 1114.

Kansas City Court of Appeals. November 20, 1939.

*Homer A. Cope, Cope & Hadsell, Roy W. Rucker* and *Walter A.
Raymond* for respondent.

*J. W. Jamison, Henderson & Deacy* and *Thos. E. Deacy* for appellants.

SHAIN, P. J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $2000, and defendants have appealed.

As defendant's main contention is that their instruction in the nature of demurrer to the evidence should have been given, because plaintiff was guilty of contributory negligence, as a matter of law,

we must necessarily state the facts in their most favorable light to the plaintiff.

These facts show that plaintiff was injured on November 12, 1934, as a result of his automobile, which he was driving, striking a boxcar, owned and operated by the defendants, with great force and violence. The collision occurred where defendants' railroad tracks cross U. S. Highway No. 160 near the railroad station at Minden Mines in Barton County. At the point in question U. S. Highway 160 runs east and west and the railroad tracks run in a northeasterly and south-westerly direction. The highway is paved with concrete for a width of twenty feet but, at the crossing, there are concrete aprons on each side of the pavement about six feet in width, making the highway at that point about thirty-two feet in width. The aprons extend east and west along the sides of the twenty feet pavement for a distance of thirty-five feet and eight inches. To the east of this crossing the highway runs straight and is level for more than a mile. There are two sets of railroad tracks at the crossing. The track to the west is the main line and the one to the east a passing track. On the night in question a southbound freight train, owned and operated by the defendants, arrived at Minden Mines about 12:30 P. M. Some switching operations being required at Minden Mines, the crew detached the engine at the north edge of the paved portion of the highway and the train, consisting of three boxcars and a caboose, was left standing north of the highway on the west or main line track, the car nearest the highway being a flat car. This car extended over the apron on the north side of the highway and south to the edge of the regular 20 foot slab of the highway or possibly a little beyond. The engine then proceeded south west on the main line track and thence northeast on the passing track and, by means of a switching operation, it conveyed four boxcars, which had been standing upon the passing track north-east of the highway, to a point southwest thereof and then on to the main line track. The engine was headed southwest with its headlight shining. To the rear and northeast of the engine were the four box-cars. The engine and the four boxcars then proceeded northeast, it being the intention to couple the cars onto the portion of the train that had been left northeast of the highway. When the boxcar fur-therest northeast was about in the center of the highway, plaintiff's automobile coming from the east, ran into it. There was no watchman, or other person, at or on the crossing and no light of any kind or character on the northeast end of the northeast, or lead, car as it was backed northeast over the crossing. There was no gate, crossing bell flashlight, wigwag or other automatic signal at this crossing. No whistle was blown during the backing operation and the locomotive bell was not ringing.

Plaintiff, a resident of Pittsburg, Kansas, on the night of November 11, 1934, had attended a dance at Prairie Center on U. S. Highway

No. 160 about five or six miles east of Minden Mines. The dance was over at 12:30 A. M. November 12th. Plaintiff alone in his car, followed by others in their cars, started west on Highway No. 160 for his home. Plaintiff had previously attended dances at Prairie Center on numerous occasions and had used the highway and was familiar with the crossing, having crossed it many times and he knew that it was a dangerous crossing. His car was in good mechanical condition, equipped with good lights, which cast rays of light for about 100 feet ahead of the car. The brakes and tires on his car were in good condition. As plaintiff approached the crossing there was no building or any other structure or obstruction to the south or southwest, or to plaintiff's left, to prevent him from seeing a train of cars approaching from that direction. When he approached within about 200 feet of the crossing he was traveling at a rate of speed of about twenty-five miles per hour. At about that time he saw the flat car standing north of the crossing. He was enabled to see this car by means of electric lights on a steam shovel boom located about 200 feet west and 300 feet north of the crossing. The lights from this boom did not reflect on the crossing itself. When plaintiff first saw the flat car he slowed down to eighteen or twenty miles per hour and pulled a little to the south and near to the center of the highway with his left wheels "I think just a little over the (middle) line" and continued down the road "about the center," "about astride of the white line." There was no moon shining and, it was dark at the crossing. The pavement was dry. There is no evidence of any atmospheric interference except the extreme darkness of the night. As before stated, plaintiff's headlights revealed the road for a distance of 100 feet ahead. He testified that he could have seen the rails of the main line track that distance away; that he knew he was approaching the crossing when he was 400 feet therefrom. Plaintiff first looked to the south when he was 200 or 300 feet away from the crossing. Thereafter, he kept looking alternatingly to the north and south until he reached a point about 100 feet away from the crossing.

As the plaintiff had a jury verdict below, we are confined within narrow limits in determining the question as to whether or not he was guilty of negligence as a matter of law. In connection with this point, we find nothing in defendants' testimony that is an aider to plaintiff, and as the plaintiff is the only witness to the direct occurence of the accident we are practically confined to his testimony in determining as to whether or not he was negligent as a matter of law.

From the evidence as we must review it, the defendants' train was moving backward without bell or whistle warning and without proper precautions as to light or attendance on the rear. It followed that the rate of speed at which the cars were approaching the crossing would be of material value in determining the question as to whether it can be declared that plaintiff was negligent as a matter of law.

Unfortunately, from the standpoint of review the only evidence as to rate of speed of the backing train comes alone from the defendants. This, of course, we cannot consider in determining the demurrer.

There are some facts testified to on behalf of plaintiff from which inference of speed might be drawn. We refer to the position on the pavement of plaintiff's car just before and after the accident. However, the character of this testimony is such that we would be invading the province of the jury by stating a promise as a basis of conclusion as to rate of speed.

As the plaintiff is entitled to have the most favorable inference that can reasonably be drawn from the testimony, we quote questions and answers occuring in the examination of plaintiff as a witness as follows:

"Q. As you proceeded in—came within a few hundred feet of the crossing of the Frisco tracks and Highway 160 what, if anything, did you see that attracted your attention? A. Just how do you mean?

"Q. I mean, did you see anything that attracted your attention as you came within 200 or 300 feet of the crossing? A. Yes.

"Q. I mean the railroad crossing? A. Yes.

"Q. What was it that you saw? A. I seen a flat car on the right hand side of the road."

Further questions and answers appear as follows:

"Q. Now, were you able to see that box car from your headlights? A. No, sir.

"Q. What was it that enabled you to see it? A. A steam shovel light.

"Q. A steam shovel light? A. Yes.

"Q. Now, did that steam shovel light blind you at all? A. No, sir.

"Q. Did the box car as you saw it appear to be off of the pavement or partially on the pavement? A. Box car?

"Q. I mean the flat car. A. The flat car?

"Q. Yes. A. Well, it seemed to be a little on the pavement.

"Q. Seemed to be a little on the pavement? A. Yes.

"Q. Had you ever seen a car of any kind sitting in that position before as you drove west on that highway? A. No, sir.

"Q. At about whate rate of speed were you proceeding? A. Well, I would say along about twenty-five miles.

"Q. At that time? A. Yes.

"Q. Now, where were you driving on the highway at the time you first saw this flat car? A. On the right hand side.

"Q. Well, over near the right hand edge of the slab? A. Yes, near the right hand edge.

"Q. Now, when you saw this flat car there did you change the position of your automobile any? A. Yes.

"Q. In what way? A. Pulled it to the left.

"Q. You mean you pulled nearer to the center of the highway? A. Yes, nearer to the center, pulled nearer to the center, yes.

"Q. And when you made that change in the position of your car where were your left wheels with reference to the center line of the slab? A. I couldn't say exactly, but—

"Q. (Interrupting) Oh, I know you cannot tell us exactly. A. No I couldn't.

"Q. But just approximately where were they? A. I was just over the black line on the left side.

"Q. You mean your left wheels were over so you were on the wrong side of the road? A. I think just over the line.

"Q. Just traveling down about the center of the road? A. Yes.

"Q. What was the reason for your changing the position of your car and getting over in the middle of the highway? A. To keep out of the road of this flat.

"Q. You thought there was danger in coming in contact with this flat car sitting there near the pavement? A. Yes.

"Q. Approximately how far away from the crossing were you at the time you made this change? A. Oh, I was back I would say a couple of hundred feet or more.

"Q. 200 feet or more? A. Yes.

"Q. As you approached the crossing did you reduce the speed of your automobile any? A. Yes.

"Q. To about what speed did you reduce your automobile, would you say, as you reached the crossing track, passing track I mean? A. Well, I would judge I would be going approximately eighteen to twenty miles an hour.

"Q. Eighteen to twenty miles an hour? A. Yes, something like that. I couldn't say exactly.

"Q. Oh; I understand. I just want your best judgment, Mr. Foster. A. All right.

"Q. You say your best judgment is that you reduced your speed to about eighteen to twenty miles an hour? A. Yes, sir.

"Q. All right, sir, Now, had you looked to the south as you approached that crossing? A. Yes, sir.

"Q. Now, as I understand it, this box car was to the north on the right hand side of the crossing? A. Box car?

"Q. I mean the flat car was on the north, or to your right? A. Yes.

"Q. Is that right? A. Yes.

"Q. Now you did look to the south as you approached the crossing, you say? A. Yes.

"Q. Now, when did you last look to the south? A. When I last looked to the south was just when I came even with the first rail.

"Q. You mean the first rail of the passing track? A. Yes.

"Q. Or the switch track? A. Switch track.

"Q. Now, then what did you do? A. Didn't have time to do nothing.

"Q. Well, now, did you look to the north any? A. Not after that.

"Q. Not after that? A. No, sir.

"Q. Now, when you looked to the south as you reached the first rail of the switch track what, if anything, did you see? A. To the south?

"Q. Yes. A. I just looked up and seen things black in front of me and everything was all over.

"Q. Now when had you last looked to the south before that time? A. *Oh, I was down, I would judge, about* 100 *feet.*

"Q. 100 feet back from the crossing? A. Something like that.

"Q. When you were 100 feet away from the crossing did you look to the south? A. Yes.

"Q. Was there anything you could see? A. Not a thing.

"Was there any light of any kind or character on the crossing or to the south of the crossing? A. None.

"Q. Was there any bell being rung on any train? A. No, sir.

"Q. Or any whistle sounded? A. None.

"Q. Now, you say—did the lights on your car then show up something black in front of you? A. Yes, when I was on the first rail of the passing track.

"Q. When you were 100 feet away you looked to the south, you say? A. Yes.

"Q. And you were traveling about eighteen to twenty miles an hour? A. Yes.

"Q. And you say you saw nothing to the south at that time? A. Nothing.

"Q. Did you look to the north after that? A. After what?

"Q. After having looked to the south when you were 100 feet away from the crossing? A. Yes.

"Q. About how far away would you say you were when you last looked to the north? A. When I last looked to the north I was getting pretty close to the track.

"Q. Now, by pretty close you mean twenty-five or thirty feet?

"Mr. Deacy: One moment. I object to leading the witness.

"Q. (Mr. Rucker) All right, what do you mean by pretty close? A. Oh, possibly—I don't know exactly.

"Q. I understand that Mr. Foster. We don't expect you to tell us exactly, but just approximately. A. Oh, probably twenty feet away. I just looked to the north and then turned and looked to the south.

"Q. That is twenty feet away from the first rail of the switch track? A. Yes.

"Q. Why did you look to the north when you were twenty feet away? A. Well, because that is a pretty bad crossing, that is, I

consider it a pretty bad crossing when there are cars standing there, I always look for fear something will come from the other way, that is from the north side. You see it is on an angle like that (indicating), and coming up this way I kind of watch them cars a little bit to see that nothing comes up behind that car. I didn't know right at that time what track that was on.

"Q. Did you see any other cars there besides the flat car? A. Not that I could recognize they was cars.

"Q. I mean flat cars or box cars? A. There was cars there, but I couldn't say what kind they were.

"Q. Did this flat car ever move from the time you first saw it until you were rendered unconscious? A. No, sir.

"Q. When you looked to the north the last time you were just going over the rail of the freight track? A. Yes.

"Q. The first rail? A. Yes.

"Q. And about that time you say your headlights showed something black in front of you, on your left? A. Yes.

"Q. Did you almost instantly strike whatever that was? A. I almost instantly struck.

"Q. During the first contact with the object there, whatever it was, did you feel anything? A. Yes.

"Q. What? A. I felt myself kind of give a jerk and move sideways, and that's all I remember." (Italics ours.)

The question before us for review is a close one and, pertinent to the issue, we cannot overlook the fact that the plaintiff had observed the danger ahead in the slightly protruding flat car at a time when he did not know whether same was on the main or on the switch track. This situation gave apprehension of a moving train coming from behind. To watch an apprehended danger is a natural impulse and as the plaintiff testifies that he looked to the south when within the 100 feet projection of his light and saw nothing, we cannot conclude from the evidence that plaintiff's particular attention directed thereafter to the north be declared to be negligence at law.

By giving to plaintiff the most favorable inference from his testimony, we conclude that we are not justified in declaring that he was negligent as a matter of law. We therefore find that there was not error in refusing to give a directed verdict for defendants.

The defendants urge as follows:

"The evidence discloses that plaintiff's own contributory negligence contributed to his injury and bars a recovery by him even though the defendants were negligent."

As the question of plaintiff's negligence was given to the jury under proper instructions, it is not within our province to disturb its findings.

The defendants make complaint as follows:

"The court erred in refusing to sustain the objection of counsel for defendants to the remarks of plaintiff's counsel in the closing

argument to the effect that the defendants were a powerful railroad corporation, and that plaintiff was an individual, and in refusing to withdraw said remarks from the consideration of the jury upon motion of defendants' counsel, and in allowing counsel for the plaintiff to again make said prejudicial remarks to the jury.''

We conclude that the whole of the proceeding touching the above is pertinent.

In the course of the argument, the following appears, to-wit:

''Mr. Ruckner (Making argument to jury) : . . .

''Gentlemen, as I told you in the beginning, the law comes to you in the nature of these written instructions and you must accept it as the law whether you want to or not. These instructions are divided really into two classes, one is the so-called cautionary instruction and among the cautionary instructions is one advising you that you must not have any feeling of prejudice against either of these parties, *merely because one is an individual and the other is a corporation*. In other words, my understanding of what the court meant by that is that because you have a *powerful railroad corporation on the one side*—

''Mr. Deacy (Interrupting) : One moment. I object to the statement of counsel, powerful railroad corporation, as being prejudicial to the defendants and ask the court to instruct the jury to disregard it.

''The Court: Well, the court has given the instructions and expects the jury to follow them.

''To which action the ruling of the court the defendants then and there at the time duly expected and still except.

''Mr. Ruckner (Continuing argument to jury) : Because you have the powerful railroad corporation on one side and an individual on the other that you should not permit that to sway or bias you in the least. Mr. Foster, true, *a coal miner* as he is, occupies the same position before this court as does the great corporation Mr. Deacy represents. That is my understanding of the meaning of the instructions that tells you that it is your duty to try this cause fairly, as though it were a suit between two individuals.

· · · · ·

''Mr. Rucker (Continuing closing argument) : Now, this man was unconscious for an hour and a half to two hours following this injury, and that, gentlemen, is a serious thing, Kuhn to the contrary notwithstanding. I will tell you, gentlemen, Kuhn is a man known around the court house as 'No Injury Harold.'

''Mr. Deacy: One moment, please. I object to the remark of counsel—

''Mr. Rucker (Interrupting) : I withdraw it.

''Mr. Deacy (Continuing) : —as being outside the evidence and being a prejudicial statement.

"MR. RUCKER: I have withdrawn the statement.

"THE COURT: Be sustained.

"MR. DEACY: I ask the court to charge the jury to disregard the improper remark of counsel.

"THE COURT: That's right, gentlemen, the remark was improper and is entirely outside the evidence and should not have been made." (Italics ours.)

We have carefully read all of the instructions in this case and find none wherein the defendant is referred to as a "corporation" nor as a "powerful railroad corporation." We nowhere find, in said instructions, the plaintiff referred to as an "individual" nor as a "coal miner." If the defendants had offered and received instructions asking that the jury disregard the fact that defendant was a corporation and that plaintiff was an individual, then in such an event the plaintiff's attorney might have been justified in giving his interpretation of such an instruction.

The issues in this case being very close, we conclude that the above language calling special attention to the fact that this is a controversy with a powerful railroad corporation on one hand and an individual coal miner on the other hand is not justified. The mere fact that an instruction admonishes a jury to "try the cause as fairly as though it were a suit between two private parties" does not justify such a prejudiced characterization which so magnifies the inequalities of the parties to the cause of action. Furthermore, regardless of withdrawal and regardless of admonition of the court, the alluding to defendants' witness Kuhn as "No Injury Harold" is not conducive of unimpassioned consideration by the jury. This is especially so as following the remarks above shown. The remarks of the court to the objection made by defendants to the first language used tended to augment the confusion that such remarks produce an depreciated the cautionary instructions that had been given by the court.

We have no desire to discourage the becoming ardor that an attorney should have for his client's cause. We conceive the fact that a law suit may credibly be designated as a "Battle Royal." However, the best interests of the legal profession are best subserved by placing a prohibition on poison gas. Taking the matter of argument, *supra*, as a whole, we conclude that the same presents prejudicial error.

Judgment reversed and cause remanded. All concur.